IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

VILLAGE SHORES LLC, Individually and On
Behalf of All Others Similarly Situated,

     Plaintiff,

v.

                                   Case No. 16-14498

LOCKWOOD, ANDREWS & NEWNAM,        Hon.
P.C., LOCKWOOD ANDREWS &
NEWNAM INC., LEO A. DALY COMPANY,
VEOLIA NORTH AMERICA, INC., VEOLIA        GCCC No. 16-107731-CZ
NORTH AMERICA, LLC, VEOLIA WATER        Hon. Richard B. Yuille
NORTH AMERICA OPERATING SERVICES,
LLC, VEOLIA ENVIRONNEMENT, S.A.,

     Defendants.

---

## NOTICE OF REMOVAL

---

TO: THE HONORABLE JUDGES OF THE UNITED STATES DISTRICT
COURT FOR THE EASTERN DISTRICT OF MICHIGAN

     PLEASE TAKE NOTICE that, in accordance with 28 U.S.C. § 1441, *et seq.*,

Defendant Veolia Water North America Operating Services, LLC, Veolia North

America, LLC, and Veolia North America, Inc. (collectively, the "Veolia entities")

hereby remove this action, Case No. 16-107731-CZ, Genesee County Circuit

Court, State of Michigan, to the United States District Court for the Eastern

District of Michigan on the ground that there is diversity jurisdiction under 28 U.S.C. § 1332.  In support of removal, the Veolia entities state as follows:

## PROCEDURAL BACKGROUND

1.   On September 12, 2016, Plaintiff Village Shores LLC filed a complaint in the above-captioned action in the Genesee County Circuit Court, Case No. 16-107731-CZ, against seven defendants hailing from several states, including the Veolia entities.

2.   In its complaint, Plaintiff brings a putative class action seeking damages for harms allegedly stemming from lead in the drinking water supply of the City of Flint, Michigan.  Plaintiff seeks to represent a class comprised of "[a]ll persons and entities that have owned residential rental property in the City of Flint, Michigan since April 24, 2014."  Compl. ¶ 177.  The complaint asserts six separate causes of action and requests substantial damages.   As 28 U.S.C. § 1446(a) requires, true and correct copies of the Complaint and Circuit Court Civil Case Cover Sheet are attached hereto as Exhibit 1.

3.   The Veolia entities acknowledged service of the complaint and summons by email on December 6, 2016.  Because it is filed within 30 days of service, this notice of removal is timely filed under 28 U.S.C. §1446(b)(1).  *See Murphy Bros., Inc. v. Michetti Pipe Stringing, Inc.*, 526 U.S. 344, 347-48 (1999) (time for removal runs from receipt of formal service of process).

4.     Under 28 U.S.C. § 1453(b), the consent of the other defendants to the putative class action—which is removable under the Class Action Fairness Act ("CAFA")—is not required.[1]

5.     Venue in the United States District Court for the Eastern District of Michigan is proper because Plaintiff commenced this action in the Genesee County Circuit Court.  *See* 28 U.S.C. §§ 102(a)(1) & 1441(a).

6.     As 28 U.S.C. § 1446(d) requires, a copy of this Notice of Removal is being served on Plaintiff and with the Clerk of the Genesee County Circuit Court.

7.     By removing this action to this Court, the Veolia entities do not waive any defenses, objections, or motions available to them under either state or federal law.

**GROUNDS FOR REMOVAL**

8.     This Court has jurisdiction over this action under 28 U.S.C. § 1332(d), which extends diversity jurisdiction to large, interstate putative class actions like this one.  In particular, CAFA expands federal courts' diversity jurisdiction to embrace "class actions in which the matter in controversy exceeds $5 million, there is minimal diversity of citizenship, and the proposed class includes at least one

---

[1] The Veolia entities understand that Veolia Environnement, S.A. ("VE"), and perhaps other defendants, have not been served with process as of the date of this filing.  This notice of removal is filed on behalf of the three domestic Veolia entities only, and not on behalf of VE or any other defendant.

hundred members." *In re Mortgage Elec. Registration Sys., Inc.*, 680 F.3d 849, 853 (6th Cir. 2012).

9.     This putative class has at least 100 members. *See* 28 U.S.C. § 1332(d)(5)(B). It means to encompass every individual or "entity" who has owned rental property in the entire City of Flint over a two-year period. The Complaint itself alleges that "hundreds or thousands" people fall within this class, Compl. ¶ 178, and roughly 22,500 housing units are allegedly rented in the City of Flint, *id.* ¶ 24. *See, e.g.*, *Law Offices of K.C. Okoli, P.C. v. BNB Bank, N.A.*, 481 F. App'x 622, 625 (2d Cir. 2012) (finding that the "pleadings" alone satisfied CAFA's "numerosity requirement" where the complaint alleged that the size of the class was "hundreds of persons"). Relevant census figures say exactly the same. *See* United States Census, *Quick Facts: Flint (City), Michigan* (Aug. 1, 2016), http://www.census.gov/quickfacts/table/HSG010215/2629000; *see also, e.g.*, *Phillips v. Severn Trent Envtl. Servs., Inc.*, No. CIV.A. 07-3889, 2007 WL 2757131, at *2 (E.D. La. Sept. 19, 2007) (looking to census figures to determine class size in action brought concerning contaminated tap water in particular community). The Genesee Landlords Association, which includes the City of Flint, likewise includes more than 600 members.

10.     This action also meets CAFA's $5 million amount-in-controversy requirement. "[A] defendant's notice of removal need include only a plausible

allegation that the amount in controversy exceeds the jurisdictional threshold." *Dart Cherokee Basin Operating Co., LLC v. Owens*, 135 S. Ct. 547, 554 (2014). Here, plausibility is easy to find, as Plaintiff seeks substantial sums, including damages for lost "goodwill" between landlords and tenants, Compl. ¶ 4, damages for lost or reduced rent from tenants, *id.*, damages for diminution in property values, *id.* ¶ 6, and monies for "property damage" to appliances and pipes, ¶ 7. Village Shores brings no fewer than six separate claims for these damages, while also pursuing punitive damages, attorneys' fees, and "disgorgement" (presumably, of the fees paid to all the defendants by the City of Flint, allegedly totaling more than $3.8 million). *Id.* 48; *see also Hayes v. Equitable Energy Res. Co.*, 266 F.3d 560, 573 (6th Cir. 2001) (including punitive damages in the amount-in-controversy calculation). With roughly 22,500 rental units in the City of Flint, damages would need to exceed about $220 per unit for damages to exceed $5 million for the entire class. Plaintiff's claims would easily meet that per unit threshold were they successful, as Plaintiff says they amount to "tens and hundreds of thousands of dollars" per property. Compl. ¶ 170; *see Graiser v. Visionworks of Am., Inc.*, 819 F.3d 277, 282 (6th Cir. 2016) (explaining that, for purposes of CAFA's amount-in-controversy requirement, the court must "aggregat[e] the claims of individual members of the proposed class"); *cf. Lizza v. Deutsche Bank Nat. Trust Co.*, No. CIV. 13-00190 HG-BMK, 2013 WL 5376036, at *6 (D. Haw. Sept. 24, 2013)

(finding that lost-use claims for 93 properties over roughly same time period easily exceeded $5 million threshold, as measured by fair market rental value); *Lee-Bolton v. Koppers Inc.*, 848 F. Supp. 2d 1342, 1354 (N.D. Fla. 2011) (concluding that amount-in-controversy was met in case involving environmental contamination of 109 properties).

11.     Finally, there is minimal diversity.  Minimal diversity is met where "any member of a class of plaintiffs is a citizen of a State different from any defendant."  28 U.S.C. § 1332(d)(2)(A); *accord Kuns v. Ford Motor Co.*, 543 F. App'x 572, 575 n.1 (6th Cir. 2013).  Plaintiff is evidently a Michigan citizen, Compl. ¶ 9, as are (almost certainly) many members of the putative class. Defendants include a Texas corporation, *id.* ¶ 11, a Nebraska corporation, *id.* ¶ 12, and a Delaware corporation, *id.* ¶ 14.

12.     There are certain exceptions to CAFA jurisdiction, but none of these exceptions apply here.  *See Meiman v. Kenton Cnty., Ky.*, No. 10–156–DLB, 2011 WL 350465, at *4 (E.D. Ky. 2011) (observing that the circuit courts have "uniformly concluded that after general CAFA jurisdiction has been established, the burden shifts to the party objecting to federal jurisdiction to show an exception" (internal quotation marks omitted)).

13.     The home-state exception, for instance, does not apply.  This exception applies if "two-thirds or more of the members of all proposed plaintiff

classes in the aggregate, and the primary defendants, are citizens of the state in which the action was originally filed." 28 U.S.C. § 1332 (d)(4)(B). Certainly, many of the putative class members are Michigan citizens, but not all of the "primary defendants" are. All of the primary defendants must be Michigan citizens for the exception to apply. *See Leonor v. Provident Life & Acc. Co.*, 790 F.3d 682, 691 (6th Cir. 2015) (noting that CAFA's home-state exception "unambiguously refers to all primary defendants for contextual reasons"). Here, there are defendants from states such as Texas, Nebraska, and elsewhere.

14.    CAFA's discretionary exception also does not apply. Under that exception, a judge may remand based on certain factors premised on the "interests of justice and the totality of the circumstances." 28 U.S.C. § 1332(d)(3). But that exception only applies when "greater than one-third but less than two-thirds of the members of all proposed plaintiff classes in the aggregate" are from Michigan. *Id.* Because the class is geographically tied to the City of Flint, that exception cannot apply here—more than two-thirds of the putative class are from this state.

15.    Nor would the local controversy exception apply. This exception may be invoked only if four distinct requirements are met: (1) two-thirds of the class are citizens of the forum state; (2) at least one defendant from whom significant relief is sought and whose conduct forms a significant basis for the claims is from the home state; (3) the principal injuries occurred in the home state; and (4) "during

the 3-year period preceding the filing of that class action, no other class action has been filed asserting the same or similar factual allegations against any of the defendants on behalf of the same or other persons." 28 U.S.C. § 1332 (d)(4)(A).

16.    At a minimum, the action does not satisfy the final requirement of the local controversy exception because other putative class actions involving these same defendants and same allegations have already been filed on behalf of this very same class.  This Court is already familiar with most of them.  *See, e.g.*, *McIntosh v. State of Michigan*, No. 5:16-cv-10571-JCO-MKM (E.D. Mich. filed Feb. 16, 2016); *McMillian v. Snyder*, No. 5:16-cv-10796-JCO-MKM (E.D. Mich. filed Mar. 7, 2016); *Washington v. Snyder*, No. 5:16-cv-11247-JCO-MKM (E.D. Mich. filed Apr. 5, 2016); *see also Mason v. Lockwood, Andrews, & Newnam, P.C.*, No. 16-106150-NM (Genesee Cnty. Cir. Ct. filed Jan. 25, 2016); *Davenport v. Lockwood, Andrews & Newnam, P.C.*, No. 16-107274-CZ (Genesee Cnty. Cir. Ct. filed July 6, 2016).  In fact, Plaintiff here drew heavily from those prior actions, cutting-and-pasting allegations from the earlier filed complaints into this one. And at least some of these other plaintiffs have already recognized that CAFA applies to cases like this one.  *See* Pls.' Resp. to State Defs.' Mot. to Dismiss Under Fed. R. Civ. P. 12(b)(1) and (6) at 15-19, *Gilcreast v. Lockwood, Andrews, & Newnam, P.C.* (No. 5:16-cv-11173-JCO-MKM), ECF No. 51.

17.    Of course, this Court has already ruled in a similar case that this last requirement for the local controversy requirement *had* been met.   *See* Order, *Davenport v. Lockwood, Andrews, & Newnam, P.C.*, No. 5:16-cv-12875 (E.D. Mich. Nov. 1, 2016).   In doing so, the Court focused heavily on the perceived purposes of the statute and the Court's observation that many Flint-related cases are in state court.   But this case proves again that there are several cases eligible to land in federal court, such that the center of activity for the class actions is here— not state court.

18.    In any event, the statute's language is plain.   Congress broadly defined the phrase "class action" to "mean[] *any* civil action filed under rule 23 of the Federal Rules of Civil Procedure or similar State statute or rule of judicial procedure authorizing an action to be brought by 1 or more representative persons as a class action."   28 U.S.C. § 1332(d)(1)(B) (emphasis added).   As the Sixth Circuit has recognized in other contexts, "[a]ny means any."   *United States v. Winans*, 748 F.3d 268, 272 (6th Cir. 2014).   Further, the statute expressly lists the very few class actions that aren't included.   *See* 28 U.S.C. § 1332(d)(5), (9).   At the same time, "other" class actions are those that present the "same or similar factual allegations" against one or more of the same defendants.   28 U.S.C. § 1332(d)(4)(A)(ii).

19.   In the face of plain language, the Court can ask only one question to resolve this aspect of the local-controversy question: whether *any* Flint-water-related class action had been filed against any defendant in this case.   *See, e.g.*, *Dutcher v. Matheson,* No. 14-4085, 2016 WL 6471724, at *4 (10th Cir. Nov. 2, 2016) (finding that the local controversy exception did not apply because of a previously-filed class action based on plain language of the exception); *Brown v. Saint–Gobain Performance Plastics Corp.*, No. 16-CV-242-JL, 2016 WL 6996136, at *4 (D.N.H. Nov. 30, 2016) (same).   Obviously, there have been.   Once that question is answered, the matter ends.   *See Kingdomware Techs., Inc. v. United States*, 136 S. Ct. 1969, 1976, 195 L. Ed. 2d 334 (2016) ("If the statutory language is unambiguous and the statutory scheme is coherent and consistent—as is the case here—the inquiry ceases." (internal quotation marks and alterations omitted)).   Even belief that the result is inconsistent with "purpose" does not change the result, as "it is not [the Court's] task to assess the consequences of each approach and adopt the one that produces the least mischief."   *Lewis v. City of Chicago, Ill.*, 560 U.S. 205, 217 (2010).   Rather, "[i]t is ultimately the provisions of our laws rather than the principal concerns of our legislators by which we are governed."   *Cooper Indus., Inc. v. Aviall Servs., Inc.*, 543 U.S. 157, 167 (2004).[2]

---

[2] *Vodenichar v. Halcon Energy Properties, Inc.*, 733 F.3d 497, 509 (3d Cir. 2013), says nothing different.   There, a group of plaintiffs had filed a class action in federal court that they then dismissed.   The same day they dismissed their first

20.    There may very well be other reasons why the local controversy exception does not apply to this case.  For instance, the exception can only apply here if there is one Michigan defendant "whose alleged conduct forms a significant basis for the claims asserted by the proposed plaintiff class."  28 U.S.C. § 1332 (d)(4)(A)(i)(II)(bb).    "[T]he significant basis provision effectively calls for comparing the local defendant's alleged conduct to the alleged conduct of all the Defendants. … If the local defendant's alleged conduct is a significant part of the alleged conduct of all the Defendants, then the significant basis provision is satisfied."  *Kaufman v. Allstate New Jersey Ins. Co.*, 561 F.3d 144, 156 (3d Cir. 2009), *cited with approval by Leonor*, 790 F.3d at 691.  But Plaintiff's muddled treatment of the Michigan and non-Michigan defendants makes it difficult to say whose conduct is really the focus of their claims.  *See, e.g.*, *Evans v. Walter Indus., Inc.*, 449 F.3d 1159, 1167 (11th Cir. 2006) (finding that local controversy exception did not apply where "plaintiffs' evidence offer[ed] no insight into whether [the local defendant] played a significant role in the alleged contamination [forming the basis for plaintiffs' claims], as opposed to a lesser role, or even a

---

action, the same plaintiffs (with the same counsel) filed a new class action asserting the same claims in state court.  In these circumstances, the Third Circuit agreed that second action was a "continuation of the first," such that the first action would not be treated as an "other class action" for purposes of the exception.  *Id.* But this case is not a "continuation" of any Flint-related class action that preceded it.  Instead, this case and the other Flint putative class actions are separate "class actions filed by different members of the same class," which even *Vodenichar* recognizes are the sort of actions that CAFA is meant to control.  *Id.* at 508.

minimal role").  And if Plaintiff were to argue that the local controversy exception applies, it would be Plaintiff's task to unwind the muddled pleading to identify a significantly involved defendant.

21.    As for any of CAFA remaining exceptions and exclusions, they do not even require discussion because they so plainly do not apply.  For example, 28 U.S.C. § 1332(d)(5)(A) excepts certain cases involving governmental defendants, but there are no such defendants here.

22.    In short, because all three of CAFA's basic requirements are met, and because none of the exceptions apply, CAFA affords this Court diversity jurisdiction.  In passing CAFA, "Congress's obvious purpose" was "to allow defendants to defend large interstate class actions in federal court."  *Freeman v. Blue Ridge Paper Prods., Inc.*, 551 F.3d 405, 407 (6th Cir. 2008).  The case that Plaintiff has brought here is just such an action, with thousands of putative class members seeking millions of dollars in damages from defendants scattered across the country.  It is the archetypal CAFA case, and it belongs here.

23.    The requirements of 28 U.S.C. § 1332 are satisfied in this case and removal to this Court based on diversity jurisdiction is justified.

WHEREFORE, having fulfilled the statutory requirements of removal, the Veolia entities respectfully remove this action from the Genesee County Circuit Court, where it is currently pending, to this Court.

Respectfully submitted,

**CAMPBELL, CAMPBELL,**
**EDWARDS & CONROY P.C.**

By: /s/ James M. Campbell
James M. Campbell
John A. K. Grunert
One Constitution Center, 3rd Floor
Boston, MA 02129
(617) 241-3000
jmcampbell@campbell-trial-lawyers.com
jgrunert@campbell-trial-lawyers.com

**BUSH SEYFERTH & PAIGE**
**PLLC**

By: /s/ Cheryl A. Bush
Cheryl A. Bush (P37031)
Michael R. Williams (P79827)
3001 W. Big Beaver Rd. Suite 600
Troy, MI 48084
(248) 822-7800
bush@bsplaw.com
williams@bsplaw.com

Dated: December 29, 2016

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on December 29, 2016, I caused to be electronically filed a NOTICE OF REMOVAL with the Clerk of the Court using the Court's CM/ECF system.  Copies were served upon:

**Via E-File:**  Genesee County Circuit Court

**Via US Mail:**

Andrew P. Abood (P43366)
David Wolkinson (P69443)
Jeffrey Lance Abood (P72607)
Erica A. DeAngelis (P75894)
ABOOD LAW FIRM
470 N. Old Woodward, Suite 250
Birmingham, Michigan 48009
(248) 549-0000
andrew@aboodlaw.com
david@aboodlaw.com
jeff@aboodlaw.com
erica@aboodlaw.com

Wayne B. Mason (SBOT 13158950)
Travis S. Gamble (SBOT 00798195)
S. Vance Wittie (SBOT 21832980)
David C. Kent (SBOT 11316400)
SEDGWICK LLP
1717 Main St., Suite 5400
Dallas TX 75201
(469) 227-8200
wayne.mason@sedgwicklaw.com
travis.gamble@sedgwicklaw.com
vance.wittie@sedgwicklaw.com
david.kent@sedgwicklaw.com

Peretz Bronstein
Himon Yiftach
BRONSTEIN, GEWIRTZ, &
GROSSMAN, LLC
60 East 42nd Street, Suite 4600
New York, New York 10615
(212) 697-6484
perertz@bgandg.com

Philip A. Erickson (P37081)
Robert G. Kamenec (P35283)
PLUNKETT COONEY
325 E. Grand River Ave, Suite 250
East Lansing, MI 48823
(517) 324-5608
perickson@plunkettcooney.com
rkamenec@plunkettcooney.com

*Attorneys for Plaintiff*

*Attorneys for Lockwood, Andrews, and Newnam, P.C., Lockwood, Andrews, and Newnan, Inc., and Leo A. Daly Company*

by placing the same in envelopes addressed as above and by causing said envelopes to be properly stamped and deposited in the mail receptacle maintained by the U.S. Government at 3001 W. Big Beaver Rd., Troy, MI.

/s/ Cheryl A. Bush
Cheryl A. Bush (P37031)
bush@bsplaw.com

# Exhibit 1

FILED
Filed - Rob Gifford
- 9/12/2016 Rob
Gifford 9/12/2016
10:20:44 AM
County Clerk
Genesee County

| STATE OF MICHIGAN | | SUMMONS AND COMPLAINT | CASE NO. |
|---|---|---|---|
| County Clerk<br>Genesee County | JUDICIAL DISTRICT<br>7th JUDICIAL CIRCUIT<br>COUNTY PROBATE | | 2016-107731-CZ<br>YUILLE |

Original - Court
1st copy - Defendant
2nd copy - Plaintiff
3rd copy - Return

| Court address | | Court telephone no. |
|---|---|---|

| Plaintiff's name(s), address(es), and telephone no(s).<br>Village Shores LLC, Individually and On Behalf Of All Others Similarly Situated | v | Defendant's name(s), address(es), and telephone no(s).<br>Lockwood, Andrews, & Newnam, P.C.; Lockwood Andres & Newnam Inc.; Leo A. Daly Company; Veolia North America, Inc.; Veolia North America, LLC; Veolia Water North America Operating Services, LLC; Veolia Environnement S.A. |
|---|---|---|
| Plaintiff's attorney, bar no., address, and telephone no.<br>Andrew Abood (P43366) David Wolkinson (P69443)<br>Jeffrey Lance Abood (P72607) Erica A. DeAngelis (P75894)<br>470 N. Old Woodward Ave, Suite 250<br>Birmingham, Michigan 48009<br>248.549.0000 | | |

**SUMMONS** **NOTICE TO THE DEFENDANT:** In the name of the people of the State of Michigan you are notified:

1. You are being sued.
2. **YOU HAVE 21 DAYS** after receiving this summons to **file a written answer with the court** and serve a copy on the other party **or take other lawful action with the court** (28 days if you were served by mail or you were served outside this state). (MCR 2.111[C])
3. If you do not answer or take other action within the time allowed, judgment may be entered against you for the relief demanded in the complaint.

| Issued<br>09/12/2016 | Summons expires<br>12/12/2016 | Court clerk<br>Tricia A Wright |
|---|---|---|

*This summons is invalid unless served on or before its expiration date  This document must be sealed by the seal of the court.

TRICIA WRIGHT
SENIOR COURT CLERK

**COMPLAINT** *Instruction: The following is information that is required to be in the caption of every complaint and is to be completed by the plaintiff. Actual allegations and the claim for relief must be stated on additional complaint pages and attached to this form.*

☐ This is a business case in which all or part of the action includes a business or commercial dispute under MCL 600.8035.

**Family Division Cases**

☐ There is no other pending or resolved action within the jurisdiction of the family division of circuit court involving the family or family members of the parties.

☐ An action within the jurisdiction of the family division of the circuit court involving the family or family members of the parties has been previously filed in _____ Court.

The action ☐ remains ☐ is no longer pending. The docket number and the judge assigned to the action are:

| Docket no | Judge | Bar no |
|---|---|---|

**General Civil Cases**

☐ There is no other pending or resolved civil action arising out of the same transaction or occurrence as alleged in the complaint.

☑ A civil action between these parties or other parties arising out of the transaction or occurrence alleged in the complaint has been previously filed in Genesee County, Seventh Circuit Court.

The action ☑ remains ☐ is no longer pending. The docket number and the judge assigned to the action are:

| Docket no<br>16-106112-CZ, 16-106077-CZ, 14-1-3476, CZ | Judge<br>Archie L. Hayman and Richard B. Yuille | Bar no<br>P37516   P22664 |
|---|---|---|

**VENUE**

| Plaintiff(s) residence (include city, township, or village) | Defendant(s) residence (include city, township, or village) |
|---|---|
| Place where action arose or business conducted | |

| Date<br>Sept. 9, 2016 | Signature of attorney/plaintiff<br>Erica A. DeAngelis |
|---|---|

If you require special accommodations to use the court because of a disability or if you require a foreign language interpreter to help you fully participate in court proceedings, please contact the court immediately to make arrangements.

MC 01  (5/15)  **SUMMONS AND COMPLAINT**   MCR 2.102(B)(11), MCR 2.104, MCR 2.105, MCR 2.107, MCR 2.113(C)(2)(a), (b), MCR 3.206(A)

STATE OF MICHIGAN

IN THE SEVENTH JUDICIAL CIRCUIT COURT FOR THE COUNTY OF GENESEE

VILLAGE SHORES LLC, Individually and On Behalf
Of All Others Similarly Situated,

                    Plaintiff,

                                         Hon.
v                                        Case No.

LOCKWOOD, ANDREWS & NEWNAM, P.C.;
LOCKWOOD ANDREWS & NEWNAM INC.;
LEO A. DALY COMPANY;                     CLASS ACTION COMPLAINT
VEOLIA NORTH AMERICA, INC.;
VEOLIA NORTH AMERICA, LLC;               JURY TRIAL DEMANDED
VEOLIA WATER NORTH AMERICA
OPERATING SERVICES, LLC;
VEOLIA ENVIRONNEMENT S.A.,

                    Defendant.

Andrew P. Abood (P43366)
David Wolkinson (P69443)
Jeffrey Lance Abood (P72607)
Erica A. DeAngelis (P75894)
ABOOD LAW FIRM
*Attorneys for Plaintiff*
470 N. Old Woodward, Suite 250
Birmingham, Michigan 48009
248.549.0000
andrew@aboodlaw.com/david@aboodlaw.com
jeff@aboodlaw.com/erica@aboodlaw.com

Peretz Bronstein (*to be admitted pro hac vice*)
Shimon Yiftach (*to be admitted pro hac vice*)
BRONSTEIN, GEWIRTZ & GROSSMAN, LLC
*Attorneys for Plaintiff*
60 East 42nd Street, Suite 4600
New York, New York 10165
212.697.6484
peretz@bgandg.com

CLASS ACTION COMPLAINT AND JURY DEMAND

1

## STATEMENT REGARDING RELATED CASES

Several civil actions between these parties or other parties arising out of the transaction or occurrence alleged in this complaint have been previously filed in this Court and other Courts. They have been assigned to Hon. Archie L. Hayman and Hon. Richard B. Yuille, and the actions are still pending.

## CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

Village Shores LLC ("Village Shores" or "Plaintiff") brings this action for damages and equitable relief individually and on behalf of a class of all others similarly situated. Plaintiff demands a jury trial. Unless stated otherwise, all allegations herein are made pursuant to Plaintiff's personal knowledge, Plaintiff's or its counsel's research and due diligence, and public information disseminated by the media, government employees, and others involved in the Flint, Michigan crisis.

### Introduction and Nature of the Case

1.      Plaintiff and the class are all owners of rental property in Flint, Michigan. These landlords rented out property to tenants with water included, at the landlords' expense. The toxic water in flint caused physical, emotional, and economic harm to the residents and property owners in Flint. Plaintiff brings this suit for damages and equitable relief against Defendants to remedy the harm they have caused.

2.      On November 29, 2011, Governor Snyder appointed an Emergency Manager over the city of Flint to save it from financial distress. In 2014, the emergency manager decided to save money by making the Flint River the city's sole water source—the previous source was safe and usable but more expensive.

2

3.    The Emergency Manager, city employees, and the companies they hired (some of whom are defendants here) failed to implement a corrosion control protocol, as required by the Safe Drinking Water Act, they and otherwise failed to exercise reasonable care with regard to Flint's water system.  As a result of this and other conduct, residents and businesses received, through unprotected pipes, toxic water with lead and other harmful chemicals. As is common knowledge, lead exposure has extensive and long-term effects on the health of adults and children.

4.    The water crisis also caused extensive economic damage to the Plaintiff who paid water bills for several years in exchange for clean water for their tenants.  Instead, they were provided toxic water.  Besides losing the benefit of the bargain, this also hurt the landlords' relationship and goodwill with tenants, both real and financial.  Many tenants refused to pay rent or agreed to only pay a lower amount than was agreed upon.  Other tenants simply fled the troubled property and city.

5.    The ordeal also damaged rental and investment property owners because the crisis caused property values to plummet.  Moreover, it is difficult to sell property, even at severely depressed prices, because buyers are scared of investing in the area.  Moreover, even if a buyer could be found, that buyer cannot secure a loan from banks and other institutional lenders that are understandably uninterested in securing a loan with damaged property or accepting the unusually high risk of securing a loan with property in Flint, Michigan.

6.    In February of 2016, Governor Snyder signed a $30 million package to refund all Flint residents' water bills for the period of April 2014 to April 2016.  Under this system, residents would receive a 100% refund for the water use portion of their bills.  However, the

3

state has and is discriminating against Plaintiff and the Class by providing them with only a 20% refund of their bills.

7. As mentioned above, Defendants' conduct has directly caused significant property damage to Plaintiff and the Class. The toxic water has irreparably damaged Plaintiff's appliances and their properties' pipes. Moreover, the stigma and media coverage associated with the water crisis has predictably reduced, and will continue to reduce, residential and commercial property values in Flint, causing further substantial financial harm to Plaintiff and the Class. Although Flint finally switched back to its prior water source after extensive media and political pressure, Plaintiff's corroded pipes and appliances remain in need of repair. The only option for Plaintiff and the Class to be assured of safe water is to entirely replace their defective pipes and appliances.

8. Plaintiff and the Class seek damages and equitable relief under theories of professional negligence, gross negligence, negligence, tortious interference with a business relationship or expectancy, tortious interference with a contract or contractual relationship, and Unjust Enrichment. The engineering firms owed Flint and its resident a duty to use due care in assuring that the city's water supply is safe. But they failed, harming many people physically and economically.

### The Parties

9. Village Shores LLC is a Michigan limited liability company with an address of 25600 Woodward Ave., Suite 111, Royal Oak, MI 48067. Its principal place of business is at 410 Lippincott, Flint, MI 48503, which is a 48 unit residential housing property. Village Shores has suffered property and monetary damages as a result of the Flint water crisis.

4

10.     Lockwood, Andrews & Newnam, P.C. ("LAN P.C.") is a Michigan professional corporation with its principal place of business at 1311 S. Linden Road, Suite B, Flint, Michigan 48532. At all relevant times, LAN P.C. held itself out to the world as a Lockwood, Andrews & Newnam, Inc. ("LAN Inc.") company. Upon information and belief, LAN P.C. was incorporated in 2008 by LAN Inc. after it was retained to conduct studies and reports of the feasibility of a new water supply for the City of Flint. Upon information and belief, work and services provided by LAN P.C. were conducted at LAN Inc.'s Chicago, Illinois location.

11.     LAN Inc. is a Texas corporation with its principal place of business at 2925 Briarpark Drive, Suite 400, Houston, Texas 77042. At all relevant times, LAN Inc. conducted business in Genesee County through Defendant LAN P.C., at 1311 S. Linden Road, Suite B, Flint, Michigan 48532. LAN Inc. is a full-service consulting firm that offers planning, engineering, and program management services, including civil infrastructure engineering and municipal water treatment and design.

12.     Leo A. Daly Company ("Daly Co.") is a Nebraska corporation with its principal place of business at 8600 Indian Hills Drive, Omaha, Nebraska 68114. Daly Co. is an international architecture and engineering firm with about 800 professional employees in 31 offices worldwide. Upon information and belief, Daly Co. is the parent company of LAN Inc. and LAN P.C.

13.     Defendants LAN P.C., LAN Inc., and Daly Co. are referred to collectively herein as, "LAN." The LAN defendants have conducted, and do regularly conduct, business in Michigan. The LAN defendants have also committed torts in Michigan. This Court has personal jurisdiction over the LAN defendants under MCL § 600.715 for each of the foregoing reasons.

5

14.     Veolia North America, Inc. ("Veolia N.A. Inc.") is a Delaware corporation with its principal place of business at 200 E. Randolph Drive, Suite 7900, Chicago, Illinois 60601.

15.     Veolia North America, LLC ("Veolia N.A. LLC") is a Delaware Limited Liability Company with its principal place of business at 200 E. Randolph Drive, Suite 7900, Chicago, Illinois 60601.

16.     Veolia Water North America Operating Services, LLC ("Veolia Water") is a Delaware Limited Liability Company with its principal place of business at 101 W. Washington Street, Suite 1400 East, Indianapolis, Indiana 46204.

17.     Veolia N.A. Inc., Veolia N.A. LLC, and Veolia Water all design and provide water solutions for communities and industries across the country.

18.     Veolia Environnement S.A. ("Veolia S.A.") is a French transnational corporation with its principal place of business at 36-38 Avenue Kleber, 75116, Paris, France. Veolia S.A. is a global provider of environmental management services. These services include the supply of water, the treatment and recovery of municipal or industrial effluent, waste collection, processing and recycling, the supply of heating and cooling services and the optimization of industrial processes. Upon information and belief, Veolia S.A. is the parent corporation of Veolia N.A. Inc., Veolia N.A. LLC, and Veolia Water.

19.     Defendants Veolia N.A. Inc., Veolia N.A. LLC, Veolia Water, and Veolia S.A. are referred to collectively herein as "Veolia." The Veolia defendants have conducted, and do regularly conduct, business in Michigan. The LAN defendants have also committed torts in Michigan. This Court has personal jurisdiction over the LAN defendants under MCL § 600.715 for each of the foregoing reasons.

20.     LAN and Veolia are herein collectively referred to as "Defendants."

6

21. John and Jane Doe Nos. 1-100, various other individuals, firms, and/or corporations, not named as Defendants herein, may have participated in the events that caused Plaintiff's and the Class's injuries. Plaintiff reserves the right to subsequently name some or all of these persons as defendants as more information is learned about them and their roles in the Flint water crisis.

### Jurisdiction and Venue

22. This Court is the proper venue for this lawsuit for several reasons. The original injuries and damages occurred in Genesee County. Furthermore, Defendants all reside and/or conduct business in Genesee County. Moreover, Plaintiff and the Class have suffered harms and incurred costs and monetary damages in Genesee County. And finally, many—if not all— of the occurrences described herein occurred in Genesee County.

23. This Court has subject matter jurisdiction over this dispute because the amount in dispute is in excess of $25,000, exclusive of costs and attorney's fees, and all of the parties have transacted business in Genesee County, Michigan at all times.

### Factual Allegations

24. There are more than 50,000 housing units in Flint, Michigan. Plaintiff and the class of property owners are renting about 45% of those units to residents. Most, if not all, of these units are provided with water included, at the landlord's expense.

25. The residents renting these units obviously rely upon the safe water that the city, state, and the class are supposed to provide to them for drinking, cooking, bathing, etc.

26. After years of economic hardship, Flint's financial situation reached a critical point in 2011. An audit estimated a $25.7 million deficit for the city; Flint's water supply fund showed a $9 million deficit.

7

27.     At that time, Governor Snyder declared Flint to be in a financial emergency and the City entered receivership. The Emergency City Governors now had the responsibility to govern the City, including operation of its utilities and other services, including its water supply. These Emergency City Governors were appointed by the Governor and employed by the State.

28.     At or around November 29, 2011, Governor Snyder appointed Michael Brown as the Emergency Financial Manager in Flint. The democratically elected offices of Flint became subordinate to Brown. According to state Congressman Dan Kildee, Brown was appointed to "simply do one thing and one thing only, and that's cut the budget – at any cost."

29.     For many decades (since 1967), Flint had been purchasing its water from the city of Detroit. The Detroit Water and Sewerage Department ("Detroit Water") had been its principal water source and the Flint River served merely a backup source in the event of a water shortage or interruption of service from Detroit Water.

30.     The emergency regime began brainstorming ways to drastically slash the cost of Flint's water and sewer system; water and sewer costs were the single largest expenditures in Flint's budget. Rowe Professional Services revealed in a September 2011 report that Flint could save money by purchasing water from the Karegnondi Water Authority ("Karegnondi") instead of Detroit Water.   However, switching to Karegnondi would require substantial and time-consuming new construction. Thus, an immediate switch away from Detroit Water would require Flint to reopen its shuttered municipal water treatment plant, which sourced its water from the Flint River before 1967.

31.     The Karegnondi was incorporated in 2010 to provide and distribute water sourced from Lake Huron.

8

32.     In August of 2012, Edward Kurtz took over as Flint's new Emergency Manager. Four months later, Michigan Treasury officials met with Flint leaders to discuss alternative sources for Flint's drinking water, including the Flint River. The officials agreed to study two potential options for water sources: remaining with Detroit Water or switching to Karegnondi.

33.     Young, Jackson & Tull, Inc. ("Tucker Inc."), an engineering consulting firm, was retained by the state of Michigan "to provide an analysis of the water supply options to assist the Treasurer to provide an analysis of the water supply options to assist the Treasurer in determining any potential risk and the best course going forward for supplying potable water to the City of Flint."

34.     In February of 2013, Tucker Inc. issued a report assessing the water supply alternatives for the City of Flint. The report discussed only financial considerations; it did not discuss any potential or actual health and safety issues related to using the Flint River as a water source.

35.     The report concluded that continuing to obtain water from Detroit Water would likely cost less than switching to the proposed Karegnondi treatment plant. However, the report also noted that Flint had an interest in attaining water autonomy. In other words, Flint had an interest in having an independent water source that would not require them to rely upon Detroit Water. The report recognized that one way that Flint could accomplish this is by transitioning to Karegnondi.

36.     On March 25, 2013, State Treasurer Andy Dillon and Gov. Snyder's Chief of Staff Dennis Muchmore discussed alternative water sources before the Flint City Council. The Council voted 7-1 to switch the water source to Karegnondi.   The vote had no legal effect because, due to the receivership, the Emergency Manager had sole authority to authorize such a

change. As mentioned above, such a switch would require immediate reliance on the Flint River as a water supply until the necessary construction would be completed.

37.     The next day, on March 26, 2013, Stephen Busch (District Supervisor of the Michigan Department of Environmental Quality ("MDEQ")) emailed Daniel Wyant (director of MDEQ) about the proposed switch to the Flint River. In that email, Busch outlined the health risks posed by switching to the Flint River as a water source. Specifically, he noted that it would, "[p]ose an increased microbial risk to public health," and "[p]ose an increased risk of disinfection by-product."

38.     Three days after Busch cautioned danger, Emergency Manager Kurtz signed a resolution authorizing Flint to enter a contract with Karegnondi. Treasurer Dillon approved that decision on April 11, 2013. Dillon noted that he was relying in part on the MDEQ's support of the project as well as Emergency Manager Kurtz's "representations that this deal will lead to substantial savings for the City over the coming decades."

39.     On April 15, 2013, four days after Dillon authorized the switch, Detroit Water wrote a letter to Kurtz and Karegnondi, urging reconsideration and offering lower rates. Detroit Water stated that its "goal is to provide the lowest-cost water solution...."

40.     This was to no avail as Kurtz signed a contract with Karegnondi the very next day, on April 16, 2013.

41.     On April 17, 2013, Detroit Water sent a letter to Flint to advise it that it will terminate its water service within a year, allowing Flint until April of 2014 to find an alternative water source until the new construction is completed for Karegnondi, which turned out to be in 2016.

42.    On June 26, 2013, Kurtz signed a resolution that allowed the city to hire LAN, which has offices in Flint, to put the city's water plant into operation and use the Flint River water.  LAN had previously advised the City regarding the design of an upgrade to the Flint Water Plant.

43.    In a January 13, 2015 document entitled "Water System Questions and Answers," the City assured citizens that "with support from LAN engineering which works with several water systems around the state, quality control could be addressed."

44.    In fact, the city hired two engineering firms, Defendants LAN and Veolia, to review its water distribution system, ensure compliance with federal and state environmental regulations, and provide expert engineering advice to Flint and its Emergency Manager.  By accepting this business and undertaking the work, Lockwood and Veolia assumed the responsibility to satisfy the standard of a reasonable engineer.

45.    As is obvious now, Lockwood and Veolia failed and acted below that standard in several critical ways.  First, Lockwood and Veolia failed to conduct a root cause analysis to determine the cause of Flint's initial water problem; this analysis would have quickly revealed that the Flint River' water was contaminated by corrosive salt accumulated from de-icing operations over decades of Michigan winters.  This also caused extensive pipe corrosion and an extreme risk of lead contamination.  A root cause analysis would have also revealed that the city had not adopted a corrosion control protocol as mandated by the Safe Drinking Water Act and the related Lead and Copper Rule.

46.    These engineering firms also ignored at least several red flags that should alert a prudent engineer to extensive corrosion problems and lead to implementation of effective protective measure.  Lockwood and Veolia failed to anticipate widespread corrosion problems in

11

light of the switch to a highly saline water source. They also failed to adequately investigate and address the present bacteria, which would have signaled corroded pipes to any reasonably competent engineer. The 2015 outbreak of Legionnaires Disease would also alert a competent engineer to corrosion problems. Another red flag was Flint's rusty and brown tap water, indicating the release of metal from the pipes.

47.    Lockwood and Veolia also acted irresponsibly by recommending that Flint double the ferric chloride in the water. A reasonable engineer would have known that ferric chloride is highly acidic and causes corrosion if used without proper buffering agents. This dangerous recommendation was carried out in Flint's water.

48.    In deciding to switch to the Flint River, the City of Flint noted LAN's "extensive experience in this field," and relied upon LAN's identification of the "engineering, procurement, and construction needs" for the project." Although Flint recognized that water from the Flint River "would be more difficult to treat," the City concluded, based on LAN's recommendations, that the Flint River was "viable as a source" of the City's water. *See* City of Flint, Water System Questions & Answers (Jan. 13, 2015), http://mediad.publicbroadcasting.net/p/michigan/files/201512/CoF-Water-System-FAQ-1-16-2015.pdf (last accessed August 22, 2016).

49.    LAN advised Flint through 2015 regarding the switch to the Flint River. LAN profited handsomely, being paid more than $3.8 million for its professional services. City officials, including Mayor Walling, relied upon LAN's advice in pronouncing the City's water to be safe.

50.    Darnell Earley took over the Emergency Manager position in October of 2013. He rejected an offer by Detroit Water to continue purchasing water from Detroit until the Karegnondi pipeline could be completed.

12

51.     Instead, the City switched to the Flint River as its water source on April 25, 2014.

52.     On that same day, a Flint news release quotes a MDEQ official: "the quality of the water being put out meets all of our drinking water standards, and Flint water is safe to drink."

53.     But Flint, the MDEQ, and all the hired engineering companies did not require or provide corrosion-control treatment to prevent lead from leaching into the pipes even though the Flint River's water was significantly more corrosive than the Detroit Water, which is sourced from Lake Huron.

54.     In fact, despite receiving the necessary permits from MDEQ to source water from the Flint River, the water system and infrastructure was not ready to become operational.

55.     Michael Glasgow, Flint's Laboratory & Water Quality Supervisor, explained in the problems in an April 14, 2014 email, only 11 days before switching to the Flint River:

> I have people above me making plans to distribute water ASAP . . . . I was reluctant before, but after looking at the monitoring schedule and our current staffing, I do not anticipate giving the OK to begin sending water out anytime soon . . . . If water is distributed from this plant in the next couple weeks, it will be against my direction. . . . I need time to adequately train additional staff and to update our monitoring plans before I will feel we are ready. I will reiterate this to management above me, but they seem to have their own agenda.

56.     Glaslow's concerns proved true and the water system was not prepared for the switch to the Flint River.   The Flint River had become contaminated with rock-salt chlorides washed into the river from road surfaces over the course of many harsh Michigan winters. The chlorides in the Flint River were eight times the levels provided in the water from Detroit Water. Chlorides are highly corrosive and must be neutralized with anticorrosive agents before entering public water systems.

57.   In May of 2014, only weeks after the switch, Flint residents flood the city with complaints regarding the smell, taste, and color of the drinking water.

58.   Despite these complaints, Mayor Dwane Walling called the water a "safe, quality product," and claimed that "people are wasting their precious money buying bottled water."

59.   But the truth became increasingly obvious as residents began to report that the water was making them sick. In fact, on August 14, 2014, Flint's water tested above legal limits for total coliform and *E. coli* bacteria. The City issued boil water advisories on August 15, 2014 and September 5, 2014 in response.

60.   In October of 2014, the Flint General Motors plant refused to continue using the river water because it's rusting car parts. In response, the city arranged for the company to tap into a different water line from Flint Township. But Flint residents are still forced to drink the river water.

61.   In response to General Motor's decision, MDEQ's Michael Prysby wrote to Stephen Busch and others that the Flint River water had elevated chloride levels. He stated that "although not optimal[,]" the water was "satisfactory." He noted that he had "stressed the importance of not branding Flint's water as 'corrosive' from a public health standpoint simply because it does not meet a manufacturing facility's limit for production."

62.   To address the bacteria problem, the City treated the water with additional chlorine. However, as has been well known for decades, in corroded pipes chlorine reacts with the bare metal instead of attacking solely bacteria. The addition of substantial amounts of chlorine to a water supply is thus ineffective in treating bacteria.

14

63.     On January 4, 2015, Flint announced that its water contains a very high level of trihalomethanes, a disinfectant byproduct. Even though this violated of the Safe Drinking Water Act, officials advised that residents with normal immune systems have nothing to worry about.

64.     The use of chlorine to disinfect water produces various disinfection byproducts, including trihalomethanes (often referred to as Total Trihalomethanes or "TTHM"). In the presence of bare pipes not protected by a corrosion control protocol, more chlorine yields more TTHM. In low dosages, TTHM is harmless. But higher levels pose serious health risks, like kidney and liver problems. That's why the U.S. Environmental Protection Agency ("EPA") and various state agencies regulate TTHM levels.

65.     It became apparent that Flint's TTHM levels were alarmingly high almost immediately following Flint's bacterial problems. This should have been a red flag. It is common knowledge in the scientific community that high TTHM levels can be a symptom of unprotected and corroding pipes.

66.     According to the World Health Organization (emphasis added):

> Chlorine . . . . acts as a potent oxidizing agent and often dissipates in side reactions so rapidly that little disinfection is accomplished until amounts in excess of the chlorine demand have been added. As an oxidizing agent, chlorine reacts with a wide variety of compounds, in particular those that are considered reducing agents (hydrogen sulfide $[H_2S]$, manganese(II), iron(II), sulfite $[SO_3^{2-}]$, $Br^-$, iodide $[I^-]$, nitrite). *From the point of view of DBP [disinfectant by-product] formation and disinfection, these reactions may be important because they may be fast and result in the consumption of chlorine*.

67.     That is exactly what happened in Flint's water distribution system. Flint and its hired engineering companies believed that the initial dosages of chlorine were not effective in treating bacteria, so they added more chlorine. Unfortunately, the problem was not that the dosage of chlorine was too low to treat the bacteria; rather, the chlorine was preferentially reacting with the bare pipes instead of solely attacking the bacteria. The pipes were bare because

the Flint River's corrosive water had stripped away the pipes' protective coating. Now Flint had a second problem: the excess chlorine generated high levels of TTHM.

68. On December 31, 2014, the first round of lead monitoring results showed a 90th percentile lead level result of 6 parts per billion with two samples above action levels for lead (15 parts per billion). Significantly, these samples were not even necessarily drawn from the highest risk homes, as required by various environmental regulations.

69. No one notified the public of these test results. However, on January 12, 2015, in response to water quality concerns and clearly highlighting knowledge of the problem, the state installed water coolers in state offices in Flint, gave state employees bottled water, and provided bottled water to visitors. Unfortunately, nobody extended these same courtesies to Flint residents—they did not receive these options, resources, or information.

70. Another problem emerged in the summer of 2014 when the Michigan Department of Health and Human Services (MDHHS) reported an outbreak of Legionnaires' disease.

71. Legionnaires' disease, or legionellosis, is a severe form of pneumonia which, when treated early enough, has a mortality rate of 20%; if left untreated, the mortality rate rises to 80%. Infection in humans occurs when water droplets contaminated with *Legionella* bacteria are inhaled or when water containing *Legionella* enters the trachea. *Legionella* has been extensively studied and the conditions for likely outbreaks of the disease are well understood.

72. The Legionnaire's outbreak is yet another red flag that should have alerted Flint officials and engineers that there is a corrosion problem in Flint's pipes. According to a briefing statement prepared by MDEQ and sent to Governor Snyder (emphasis added):

> Most of the city's 550 miles of water mains are now over 75 years old and constructed of cast iron piping. *Cast iron pipe is subject to internal corrosion*, called tuberculation, which causes buildup on the pipe interior, *leading to water quality issues*, reduced flow

16

and pressures, and leakage. Tuberculation also encourages *the development of biofilms, layers of bacteria that attach to the interior pipe wall*.

73.     The MDHHS also first noted another problem related to Flint's water in September of 2014. According to an internal memo—not released to the public until much later—MDHHS warned that lead poisoning rates "were higher than usual for children under age 16 living in the City of Flint during the months of July, August and September, 2014."

74.     Despite the MDEQ's report that Flint's water tests revealed TTHM levels in excess of that allowed under federal law, on January 6, 2015, Flint's former mayor, Dayne Walling, told Flint's residents the water was safe, assuring them that his family used it.

75.     Later, on January 9, 2015, the University of Michigan announced to the public its own study that revealed heightened lead levels found in some of its drinking fountains.

76.     On January 12, 2015, in response to Flint water crisis, Detroit Water offered to reconnect Flint at no additional charge, allowing Flint to avoid a $4 million reconnection fee. But the Emergency Manager refused.

77.     Despite all of its knowledge that the city's water is dangerous, Flint and Defendants took no steps to address its corrosion control problems. In fact, officials took affirmative steps to conceal their exclusive knowledge from the public.

78.     A recent scientific study found lingering traces of *Legionella* in Flint's water supply. Even after switching Flint's water back to Detroit Water, researchers were able to culture *Legionella* bacteria from sample sites in Flint. According to Dr. Otto Schwake, a postdoctoral fellow at Virginia Tech University, the corrosion of Flint's pipes may have left them "permanently more conducive to *Legionella*."

79.     As mentioned above, Flint hired two engineering companies, LAN and Veolia, to analyze the situation and advise Flint on how to make the water safe.

17

80.    Flint first hired LAN.  On June 26, 2013, it was resolved by Emergency Manager Kurtz, that the City would "enter into a Professional Engineering Services contract with Lockwood, Andrews & Newnam, Inc. for the administration of placing the Flint Water Plant into operation using the Flint River as a primary drinking water source at a cost of $171,000.00." In addition to Kurtz's signature, the resolution was also approved by Peter M. Bade, the Chief Legal Officer, and Gerald Ambrose, who was acting as the Finance Director at the time.

81.    Flint initially hired LAN to complete an "Operational Evaluation Report" ("OER") in conformance with EPA guidelines with the goal to determine the cause(s) of high levels of TTHM and evaluate possible solutions." The EPA's guidelines for completing an OER include examining whether there has been a change in water source or quality, which includes an examination into the pH of the water. Additionally, the guidelines require an examination into whether there has been any change in chemical applications including changing dosage or chemicals."

82.    The scope of LAN's assignment expanded over time and LAN was ultimately paid approximately $3.8 million for work it performed in connection with the Flint water system between 2013 and 2015.  As recently as November of 2015, LAN was retained pursuant to a $907,000 "add-on" to its existing contract to advise Flint regarding the transition to the new Karegnondi plant.  Throughout the relevant time period, Flint officials relied on LAN to use its professional expertise to properly advise them on how to maintain the safety, quality and reliability of Flint's water supply.

83.    Flint also issued an Invitation to Bid for Professional Water Consultant Engineering Services. Flint sought to engage an engineering company to "review and evaluate the water treatment process and distribution system, provide recommendations to maintain

compliance with both state and federal agencies, and assist in implementing accepted recommendations." The Invitation to Bid further specified that the engineering firm would be asked to provide an "[e]valuation of the City's processes and procedures to maintain and improve water quality," and a "[r]eport that outlines recommendations that will improve the water treatment and distribution system." Despite the extensive nature of the services requested, the price of Veolia's bid was only $40,000. No other company even submitted a bid.

84.     Flint accepted Veolia's bid. On February 10, 2015, Veolia and the City issued a joint press release to the community at large, indicating that Veolia was an "urban water expert" in "handling challenging river water sources" and that it would essentially be evaluating all of the City's water treatment processes.

85.     LAN's and Veolia's performance of their professional duties fell far short of the appropriate standard of care that would have been employed by an engineer of ordinary learning, judgment, and skill. Specifically, LAN's and Veolia's professional negligence took two forms: (1) a failure to conduct a root-cause analysis that would have identified the need for corrosion control, and (2) the recommendation to add ferric chloride rapidly increased the rate of corrosion and amount of lead that leached into Flint's drinking water. Both of these significantly damaged the health of Flint residents and the class's property and property interests.

86.     In February of 2015, LAN issued a report titled, "Trihalomethane Formation Concern," and on March 12, 2015, Veolia issued its report, "Flint Michigan Water Quality Report." Significantly, both reports are missing a root cause analysis identifying corrosion as a cause of Flint's high TTHM levels. LAN's and Veolia's failure to perform a root cause analysis constituted professional negligence.

19

87.     A root cause analysis is a process for investigating and categorizing the root causes of events with safety, health, environmental, quality, reliability, and production impacts. The purpose of a root cause analysis is to identify why a given event occurred. Understanding why an event occurred is critical to developing effective recommendations for how to solve the problem.

88.     It is illogical to provide recommendations to Flint on how to solve the water crisis when LAN and Veolia do not know what is caused the crisis in the first place.

89.     If Defendants had conducted a root cause analysis, they would have discovered that the Flint River, like many urban rivers, was highly contaminated with salt from road de-icing operations that was likely corroding Flint's pipes. Salt contains sodium and chloride. Chloride is very corrosive to iron pipes. Having identified the root cause, they would have prompted Flint to address the root issue – a course of action that would have prevented almost all of the tragic consequences that actually followed. Instead, both LAN and Veolia blindly assumed that poor disinfection effectiveness was the cause and provided recommendation based on this faulty assumption.

90.     The Defendants' negligence is shocking. LAN and Veolia ignored several red flags that should have alerted them, or any other qualified engineer, to the extensive corrosion and pH problems with Flint's water system.

91.     For example, it should have been obvious to LAN and Veolia – self-professed experts on water quality and treatment issues – that a small river in an urban environment, such as the Flint River, would be contaminated by chlorides from salt used in road de-icing operations over decades of harsh Michigan winters. It is well known that chloride concentrations in northern U.S. rivers have increased dramatically over time with average concentrations approximately

20

doubling between 1990 and 2011. This is particularly evident in cold, urban settings, such as Flint, Michigan, where there are both significant snowfalls and dense roadways that require de-icing. Chloride contamination should have been obvious to water-engineering specialists such as LAN and Veolia given these characteristics.

92.     Indeed, in February of 2004, the MDEQ, the U.S. Geological Survey ("USGS"), and the City completed an assessment of the Flint River as a possible source of drinking water and concluded that it had a very high susceptibility to potential contamination sources. *See* City of Flint, *City of Flint 2014 Annual Water Quality Report* at 2 (2014), https://www.cityofflint.com/wp-content/uploads/CCR-2014.pdf (last accessed August 22, 2016).

93.     In addition, Defendants should have realized from the Flint River's elevated chloride levels—8 times that of Detroit Water—that there was a serious corrosion issue.

94.     The Flint River water also had an extremely high chloride-to-sulfate mass ratio ("CSMR") of 1.6. Normally, a CSMR ratio of greater than 0.5 is a cause for serious concern. Had LAN or Veolia investigated the chloride-to-sulfate ratio in the Flint River, as would be expected of an engineer of ordinary diligence, they would have immediately learned that there is a serious corrosion risk.

95.     The inability to effectively treat *E. coli* with chlorine should have likewise alerted LAN and Veolia to the existence of corrosion. It is well established by governmental authorities and the scientific community that the inability to treat *E. coli* with chlorine is often caused by heavily corroded piping. According to a study published by the EPA, high *E. coli* concentrations are a product of corrosion, and the inability to treat *E. coli* with chlorine is caused by corroded pipes. Flint's inability to treat *E. coli* with chlorine – and the resulting TTHM problem – should

have placed LAN and Veolia on notice that Flint's pipes were corroding and releasing lead and other materials into the drinking water supply.

96.    The increase of reported cases of Legionnaires' disease, reported during a press conference prior to hiring Defendants', should have similarly alerted Defendants that Flint's water system exhibited signs of corrosion.  One of the most common causes of Legionnaires' disease is exposure to impacted potable water. While *Legionella* is found widely throughout the environment, an outbreak is quite uncommon.  Outbreaks are related to environmental factors, not person-to-person exposure.  Flint's outbreak of Legionnaires Disease indicated the presence of *Legionella* bacteria in Flint's pipes and the likely presence of pipe corrosion.

97.    *Legionella* exhibits several properties that allow them to persist in extreme environmental conditions such as low and high temperatures, presence of disinfectants, low pH, low nutrients and high salinity. Ideal growth conditions are in warm water between 35° and 46° Celsius (C) (95°–114.8° Fahrenheit (F)). These environmental conditions promote and protect *Legionella* growth due to the association between *Legionella* and biofilms, as well as their symbiotic and parasitic interactions with other microorganisms. They are also ideal conditions for pipe corrosion.

98.    Legionnaires' disease is associated with biofilms and corrosion in piping systems, and water with a pH in the range of 5.0 to 8.5. All of these conditions were present in the Flint water supply, yet neither LAN nor Veolia made any recommendations to treat the water to prevent or abate an outbreak. LAN and Veolia should have known that the outbreak of Legionnaires' disease was related to corroding pipes, and should have recommended steps to abate the corroded pipe and conditions causing corrosion.

22

99.     Moreover, in constructing and maintaining drinking water systems, operational and procedural efforts must be taken to prevent the growth of *Legionella*, including an assessment of the quality of the source water and the installation, operation, and maintenance of systems to protect the installations from sludging, lime scale deposits, and corrosion. Neither LAN nor Veolia recommended any of these steps.

100.    Finally, the color of Flint's water alone should have led any reasonable engineer to the conclusion that Flint's pipes were dangerously corroded.  The source of Flint's water discoloration was rust, a product of corrosion.  The presence of rust in the water should have suggested to LAN and Veolia that Flint's water was corroding its pipes, and that there was thus a danger that lead was leaching into the Flint water system.

101.    In addition, it was also very well known in the scientific community that pipes, especially old municipal water service lines, contain lead and that corroded pipes leach lead into the drinking water supply.  The federal government mandates corrosion control protocols in order to protect the public against the possibility of lead entering the drinking water due to corroding pipes.  Concern over lead concentrations in drinking water motivated the passage of the Lead and Copper Rule ("LCR") in 1991. The LCR requires utilities to implement methods to control lead corrosion if the 90th percentile of samples exceeds the action level of 0.015 mg/L. *See* 40 C.F.R. pt. 141, subpts. E and I.

102.    Flint's lack of a corrosion control protocol constituted a clear violation of the EPA's Lead and Copper Rule. Given this violation, Veolia's conclusion in its March 12, 2015 report that its "review of water quality records for the time period under our study indicates compliance with State and Federal water regulations" was clearly false.

103.    Veolia suggested the implementation of corrosion control (here the addition of phosphates or other corrosion controls) as a *possible*, but not wholly effective means for minimizing water discoloration. Veolia's report states, "The water system *could* add a polyphosphate to the water as a way to minimize the amount of discolored water." The report explains that, "Polyphosphate addition will not make discolored water issues go away." Thus, rather than recognizing that corrosion control was *required* to render Flint's water system compliant with federal regulations and prevent catastrophic corrosion, Veolia *knew* Flint did not have a corrosion control protocol and undermined the importance of installing one by stating that it was unlikely to be effective in addressing discoloration (without the slightest mention of the urgent need to implement this to address the severe lead contamination in the water). Even Veolia's suggested dosage of polyphostphate, 0.5 mg/L, was far too low. The City is now adding four to eight times as much polyphosphate, 2 to 4 mg/L.

104.    Veolia knew or should have known that the Flint water system was in violation of federal safe drinking water standards. Its affirmation that Flint was in compliance with federal environmental standards – a false assurance that Flint's water was safe – illegally instilled confidence in Flint's water on behalf of both the City and its residents. As a direct and proximate result, Flint did not take further steps to resolve its water problems and the corrosion continued, making its residents sick and damaging the class's property interests.

105.    For these and other reasons, LAN also knew or should have known that Flint's water was in violation of federal regulations and causing corrosion. Instead, LAN drafted a generic report that encouraged a continued course of neglect.

106.    Defendants should have, but failed to, quickly realize that the pipes were corroding and releasing lead and other harmful substances into Flint's water, and that the

24

corrosive water was coursing through residents' and property owners' homes, residential buildings, and businesses. LAN and Veolia negligently failed to make these basic observations and, as a direct and proximate result, pipes throughout Flint corroded. Their failure to conduct the proper analysis constituted professional negligence.

107. In addition to failing to conduct any proper root cause analysis, Defendants affirmatively exacerbated Flint's corrosion problem by advising Flint to add ferric chloride – a very potent, corrosive acid – without the addition of an alkaline buffer to raise the pH. This aggravated the problems with Flint's water by rapidly increasing the rate of pipe corrosion and the amount of lead in the water.

108. Ferric chloride is a coagulant that is added at the water treatment plant to bind water impurities together so that they settle out of the water at the treatment plant. But ferric chloride is highly acidic and corrosive: if not buffered by an alkaline substance, it attacks the pipes throughout the distribution system, causing lead and other materials from the pipes to be released into the drinking water. Accordingly, it is universally agreed that to reduce corrosion, some form of phosphate or other corrosion control must be added to coat the pipes. This industry practice applies to minimizing the impact of ferric chloride and any other chloride from other sources (*e.g.*, the Flint River). And, as discussed above, the Federal Safe Drinking Water Act mandates corrosion control.

109. Veolia represented in its March 2015 report that prior to arriving at its conclusions, Veolia undertook "laboratory testing" and concluded that, "[c]urrent ferric chloride dosages are too low and dosages of 100 mg/L or more are recommended." Veolia acknowledged that its recommended increase was significant: "This increase to 100 mg/L is twice what is currently being fed and much higher than what had previously been fed last year."

110.   Veolia's directive that the City doubles its dosage of ferric chloride was unqualified: Veolia failed to warn that ferric chloride could increase corrosion. Moreover, Veolia failed to inform Flint that in order to increase the dosage of ferric chloride (or to use any chloride at all) it must also raise the water's pH and use phosphate to protect the pipes from corrosion.

111.   In August of 2015, LAN made the same recommendation to increase the dose of ferric chloride.

112.   LAN and Veolia should have warned Flint that the addition of phosphate and a pH buffer was required to prevent the leaching of lead from pipes, especially if the ferric chloride concentration was increased. But Defendants failed to provide such a warning.

113.   As a direct and foreseeable result of LAN's and Veolia's recommendations, Flint increased the ferric chloride dosage without adding corrosion controls.

114.   The ferric chloride added to Flint's water system at LAN's and Veolia's suggestion caused substantially greater amounts of lead to leach into Flint's water supply.

115.   The impact of acid on metal, which includes the pipes and appliances in Flint, is well known to water experts. As indicated by the Centers for Disease Control and Prevention:

> Chemical additives are added to water during the water treatment process. More than 40 chemical additives can be used to treat drinking water. Many of these commonly used additives are acidic, such as ferric chloride and aluminum sulfate, which are added to remove turbidity and other particulate matter. . . . These acidic water treatment additives can interfere with corrosion protection. . . . Lead and copper are rarely detected in most drinking water supplies. However, these metals are a concern to consumers. Because some household plumbing fixtures may contain lead or copper, corrosive waters may leach (pick up) lead and copper from household plumbing pipes after entering a home. . . . The most common reason for water utilities to add corrosion inhibitors is to avoid lead and copper corrosion with older homes, and the second most common reason is to minimize corrosion of pipes in the distribution system. . . . The tendency of water to be corrosive is controlled principally by monitoring or adjusting the pH, buffer intensity,

alkalinity, and concentrations of calcium, magnesium, phosphates, and silicates in the
water.

Centers for Disease Control and Prevention, *Fluoridation of Drinking Water and Corrosion of*

*Pipes in Distribution Systems Fact Sheet*,

http://www.cdc.gov/fluoridation/factsheets/engineering/corrosion.htm (last updated July 10,

2013)(last accessed August 22, 2016).

116.    The Flint Water Study Group from Virginia Tech University displayed findings

that show that the pH of Flint's water distribution system became more acidic after the Veolia

Report was issued in March, even as the pH in the Flint River became less acidic. The group

released the following chart to illustrate this point.



117.    The graph above shows that the Flint River had a pH at or above 8.0 S.U. for all

of 2015 and that it increased after June. By comparison, the graph shows that the pH in Flint's

municipal water supply started dropping steadily from 7.9 S.U. in March (just after Veolia made

its recommendation to double the ferric chloride concentration) to 7.3 S.U. in August. This

difference is significant because pH is measured on a logarithmic scale, which means that a pH

of one whole number, such as 7.0 S.U., is ten times more corrosive than a pH of another whole number, such as 8.0 S.U. The drop in pH from 7.9 to 7.3 indicates a dramatic increase in the corrosivity of Flint's water.

118.   The graph also includes quotes from Defendants' emails and other documents that illustrate the contradictory information provided by State officials regarding the existence of corrosion control measures and lead in Flint's drinking water.

119.   Of course, these are also the very findings and conclusions that the EPA reached on June 24, 2015 about Flint's addition of ferric chloride:

> In addition, following the switch to using the Flint River, the City of Flint began adding ferric chloride, a coagulant used to improve the removal of organic matter, as part of the strategy to reduce the TTHM levels. *Studies have shown that an increase in the chloride-to-sulfate mass ratio in the water can adversely affect lead levels by increasing the galvanic corrosion of lead in the plumbing network.*

Memorandum, High Lead Levels in Flint, Michigan - Interim Report, from Miguel A. Del Toral, Regulations Manager, Ground Water and Drinking Water Branch, to Thomas Poy, Chief Ground Water and Drinking Water Branch (June 24, 2015) (emphasis added).

120.   The EPA has explained that, "[c]ontrolling corrosion in the distribution and domestic piping systems is dependent on multiple water quality parameters (listed above), all of which can change when enhanced coagulation or enhanced softening is implemented." EPA Office of Water, *Enhanced Coagulation and Enhanced Precipitative Softening Guidance Manual* § 6.4, (EPA 815-R-99-012, May 1999) (hereinafter, "EPA Guidance").

121.   This is true because, "[i]f the raw water for a utility has a relatively high concentration of chloride and a history of lead corrosion problems, coagulants that add to chloride concentration should be avoided. Also, since a lower pH will increase corrosion in

28

almost all cases, a utility should consider the finished water pH goal before implementing enhanced coagulation." *Id*.

122.    "Enhanced coagulation and enhanced softening may change the chemistry of the water entering the distribution system. *Before enhanced coagulation or enhanced softening is implemented, the current corrosion control strategy should be reviewed*. . . . If the recommended mitigation actions represent a major change in corrosion control, the utility can conduct pilot-scale (pipe loop) studies to confirm that the mitigation actions will meet the existing corrosion control goals." Id. (emphasis added)

123.    "The vast majority of U.S. utilities were able to comply with [U.S. EPA's] lead and copper rule by: 1) pH and alkalinity adjustment, most frequently to the pH range of 9.0->9.5 for systems with extensive lead piping; 2) dosing of orthophosphate in the pH range of approximately 7.2 to 8.0 S.U.; or 3) the formation of insoluble $PbO_3$ deposits through chlorination to high ORP [and sometimes concurrent adjustment to > 9 S.U." IWA Guide at 46.

124.    LAN and Veolia should have recommended adding a stronger buffering agent such as sodium hydroxide or sodium carbonate to raise the pH in the water treatment system.

125.    Both LAN and Veolia analyzed the pH in Flint's water. Both made recommendations about the addition of chemicals that affect pH. Both were negligent in their analysis of the pH and their recommendations. Had the City started adding polyphosphate or otherwise controlled for corrosion, or avoided increasing the dosage of ferric chloride, Flint's water would have been less corrosive and, consequently, less lead would have leached into Flint's water.

29

126.   LAN and Veolia were hired for the express purpose of determining the cause of Flint's water problems and identifying the corrective measures necessary to render Flint's water system compliant with state and federal regulations.

127.   LAN and Veolia entirely failed to satisfy the reasonable professional standard by conducting a root cause analysis which would have revealed that corrosion played a significant role in Flint's TTHM levels and, relatedly, caused lead and other materials leaching into Flint's water supply. Moreover, a proper root cause analysis would have revealed the complete absence of any corrosion control protocol as required by federal environmental statutes.

128.   Despite recognizing that Flint did not have a corrosion control protocol as required by the Lead and Copper rule, LAN's and Veolia's reports implicitly and explicitly deemed Flint's water system compliant with federal regulations. By doing so, LAN and Veolia wrongly bestowed Flint's water with their false seal of safety.

129.   On February 4, 2015, Flint resident LeeAnne Walters's son developed rashes all over his body. After showing a video to the Flint City Council, the City tested her water for lead on February 26, 2015 and results were extremely high.

130.   Jennifer Crooks of the EPA explained in an email to MDEQ's Busch and Prysby, "[t]hat the different chemistry water is leaching out contaminants from the insides of the biofilms inside the pipes. I think Lead is a good indication that other contaminants are also present in the tap water, that obviously were not present in the compliance samples taken at the plant."

131.   The Regulations Manager of the Ground Water and Drinking Water Branch of the EPA, Region 5, Miguel Del Toral, followed up with another question for MDEQ, which he asked Ms. Crooks to pass along. Ms. Crooks emailed Mr. Busch and Mr. Prysby the following

on February 26, 2015: "Miguel was wondering if Flint is feeding Phosphates. Flint must have Optimal Corrosion Control Treatment-is it Phosphates?"

132.    On February 27, 2015, MDEQ's Stephen Busch falsely informed the EPA that, "The City of Flint . . . Has an Optimized Corrosion Control Program [and] Conducts quarterly Water Quality Parameter monitoring at 25 sites and has not had any unusual results."

133.    On March 3, 2015, after the City increased its ferric chloride dosage to address TTHM levels, Ms. Walters's home was retested and showed *lead levels of 397, more than twenty-six times the legal limit*. Again, neither the City nor the professional engineers retained to advise Flint regarding its water system did anything to investigate, fix, or inform the public regarding the extreme hazard posed by the City's water supply.

134.    Ms. Walters first took her son to a local healthcare facility to have his blood tested for lead. The local facility reported blood levels of 3 $\mu$g/dL. Fearing that the local health department had a conflict of interest, Ms. Walters took her son to another facility to have his blood re-tested for lead on March 27, 2015. This test reported a blood lead level of 6.5 $\mu$g/dL – higher than the CDC's 5 $\mu$g/dL threshold.

135.    Ms. Walters brought this information to the attention of local health officials. Far from recognizing the danger posed by this result, Ms. Walters's concerns were casually dismissed and even belittled. "He is barely lead poisoned," Ms. Walters was told by a state nurse, "If CDC had not changed their lead poisoning standard from 10 down to 5, we would not be having this conversation." The same nurse continued, "I am working with kids in their 40's and 50's. It is just a few IQ points . . . it is not the end of the world."

136.    Ms. Walters's water was again retested on April 28, 2015. *Those tests showed extremely high lead levels of between 200 ppb and 13,200 ppb, with an average of 2,429 ppb.*

31

*The legal limit is 15 ppb – accordingly, at the high-end, the lead in Ms. Walters' home was 880 times the legal limit.* These tests were conducted by scientists at Virginia Tech University, which reported a correlation between lead and phosphate that was consistent with the dislodging of the pipe scale from the service line. Virginia Tech assembled a volunteer group of scientists to investigate the Flint water system. That team, led by Dr. Marc Edwards, a professor of civil engineering, created the Flint Water Study, which has sought to compile information related to the Flint water crisis. In response to Virginia Tech's results, the City and Defendants remained silent.

137.    In May 2015, the City tested two additional sites and both tested above the legal limit. Moreover, these results likely *underestimated* the full extent of the lead problem because the sampling protocol used by the City involved "pre-flushing" before collecting samples. According to an EPA official, "pre-flushing before collecting compliance samples has been shown to result in the minimization of lead capture and significant underestimation of lead levels in the drinking water." Pre-flushing, while not expressly prohibited, "negates the intent of the rule to collect compliance samples under 'worst-case' conditions." No public announcements were made regarding the existence of lead in Flint's drinking water.

138.    Having seen no action from Michigan, MDEQ, or the City in response to its prior letter regarding the Walters' high lead tests, EPA's Del Toral drafted and sent a memorandum to other EPA and MDEQ officials on June 24, 2015. In that memorandum, Mr. Del Toral stated that the EPA's "major concern from a public health standpoint" was "the absence of corrosion control treatment in the City of Flint for mitigating lead and copper levels in the drinking water."

139.    Del Toral specifically noted that the extent of the corrosion and corresponding lead in Flint's water was directly related to the City's use of ferric chloride to remove bacteria

32

and reduce TTHM levels. Del Toral explained what *any reasonable engineer* should have already known, "[s]tudies have shown that an increase in the chloride-to-sulfate mass ratio in the water can adversely affect lead levels by increasing the galvanic corrosion of lead in the plumbing network."

140.   Moreover, initial tests for lead in Flint's water were not done in compliance with federal regulations. Specifically, water samples tested for lead during the first six months of 2015 were incorrectly labeled as having come from homes with lead service lines when, in truth, the samples had been taken from homes with underground plumbing made of copper, galvanized steel, or other materials that pose lower risks of corrosion, according to the City's own documents.

141.   The City's failure to correctly identify its water samples as coming from homes facing lower risks of corrosion not only gave the City and the public a false sense of security regarding the presence of lead in Flint's drinking water; this failure also constituted a violation of federal environmental laws which require water sampling be done at "high-risk" locations to ensure that high levels of lead or copper are detected as soon as possible. Lead service lines are most likely to leach lead into water and the American Water Works Association has stated that cities like Flint should have been collecting 50 percent of samples from such high-risk homes.

142.   Michael Glasgow has admitted that the City did not comply with required protocols in selecting samples. Michigan Live has reported that, in response to questioning, Glasgow claimed the City struggled to collect the number of samples required following the water source switch and, as a result, had to rely on samples from lower-risk households. He explained that Flint never assembled the proper records regarding the location of lead service

33

lines and instead, was forced to rely on a hodgepodge of scattered records, which failed to accurately identify at-risk homes.

143.   As a result, the City failed to promptly and fully identify the presence of lead in Flint's drinking water. These failures delayed corrective action and wrongly induced a belief among Flint's citizens that the water was safe. Flint's water crisis did not begin to get the attention it needed until an EPA memorandum on the crisis was leaked to the ACLU and the press, prompting lawsuits and investigations. Concerns regarding corrosion of Flint's pipes and corresponding lead levels continued to rise. In August 2015, a Virginia Tech study confirmed what many had long suspected: the Flint River was substantially more corrosive than Flint's prior water source with about eight times the amount of chloride. In September, Virginia Tech's analysis of water samples from 300 homes around Flint revealed many tests in excess of federal limits including a number of samples approaching levels considered "hazardous waste." The problem was widespread: according to this report, 40% of the homes that were tested had elevated lead levels.

144.   On October 16, 2015, at least eight months after being notified of illegally high lead levels in the water and more than a year after public officials recognized that corroding pipes were causing contamination of the community's water, Flint finally switched back to using receiving water from Detroit Water.

145.   In an email dated October 18, 2015, from MDEQ Director Wyant to Governor Richard Snyder and other officials, Wyant admitted that Flint and the other governmental agencies had violated federal law by failing to implement optimized corrosion control. He wrote, "I believe now we made a mistake. For communities with a population above 50,000, optimized corrosion control should have been required from the beginning."

146.    It was not until these mistakes came to light that the City took the steps necessary to begin to bring Flint into compliance with federal environmental laws. On October 30, 2015, MDEQ emailed Glasgow, instructing him to institute the requisite corrosion control.

147.    By this point, unfortunately, the damage was already done. The City acknowledged that it would take at least three weeks for water from the Flint River to flush out of the pipes. But even after that, the pipes were corroded to a point where the only viable means for ensuring the transportation of safe water into homes, residential buildings, and businesses was replacing the pipes.

148.    While there have been several governmental bodies, such as Flint Water Advisory Task Force and Congress, that have held hearings on the Flint water crisis, none of these investigations have resulted in any compensation being awarded to Plaintiff or the Class. And none have fully investigated the role of LAN and Veolia in causing this crisis.

149.    On January 5, 2016, Gov. Snyder declared a state of emergency in Flint. The Department of Justice opened an investigation into the issue.

150.    On January 12, 2016, Gov. Snyder called out to the National Guard to distribute bottled water and filters in Flint.

151.    The next day, Officials reveal a spike in cases of Legionnaires disease, including 10 deaths, after the city started using river water.

152.    A few days later, on January 16, 2016, President Obama signed an emergency declaration and ordered federal aid for Flint.

**Defendants Have Caused Extensive Property Damage**

153.    In addition to the obvious health problems that many Flint residents have suffered and health risks posed to all Flint residents as a result of the contaminants in their water, as a

35

direct, proximate and foreseeable cause of Defendants' conduct, Plaintiff and the Class have suffered extensive property damage, included the ones enumerated above at ¶¶ 4-8 and the ones immediately following below.

154.    The Class-owned pipes and appliances themselves have corroded, shortening their life span, and causing further damage when they break.

155.    The corroded pipes and appliances remain a continuing source of lead and potentially Legionella – thus, pipes and appliances must be replaced or else may remain a continuing source of harmful exposure.

156.    The value of Plaintiff's and the Class's real property has been substantially diminished as a result of the continuing questionable safety of Flint's water and existence of corroded pipes and appliances.

157.    As a result of the water crisis, many tenants refused to pay rent or simply left the premises.  Some tenants paid less than the full rent amount.  And it is difficult to find new tenants to rent units.  Even if found, the rental value is now much lower.  Plaintiff and the Class have been forced to offer lower rent to entice renters.  This results in lower revenue.  As a result, the Class has experienced a lower occupancy level than before the water crisis and receives lower revenue.

158.    In addition to diminished property values, it is difficult or impossible to find a buyer to purchase these investment properties.  And even if a buyer could be found, it's difficult or impossible to obtain a loan because banks and other institutional lenders are uninterested in securing their money with damaged and undesirable property.

159.    Understandably, certain banks and mortgage companies have refused to make loans unless the borrower establishes that its water is potable.  A Wells Fargo & Co.

36

spokeswoman said it is reviewing government lending guidelines: "[u]ntil [water] testing and potability is affirmed, it will be difficult to lend," said the spokeswoman, who said such difficulties would apply to all lenders. Representatives from Bank of America and J.P. Morgan similarly have acknowledged requiring verification of potable water to provide financing to Flint's residents. Lenders claim their hands are tied. As the Federal Housing Administration, which backs loans to less-creditworthy borrowers, explained, government regulations require "a continuing and sufficient supply of safe and potable water" to provide home financing.

160. Further, lenders do not want to lend because they are concerned that property owners will not be able to cover mortgage costs and as result of the difficulty of finding renters at market value prices. Moreover, Lenders do not want to secure their own investment with damaged property.

161. For the same reasons, it is difficult or impossible to refinance properties.

162. As a result of all the above, it is difficult to find new tenants, receive a fair rental amount, or even sell the property at any price.

163. As a result of the above, some members of the Class had difficulty making mortgage payments for their property because they rely on a steady cash flow from tenants to make such payments.

164. Although the City has begun adding polyphosphate to its system to reduce the leaching of lead from its service lines, this is unlikely to render Flint's water safe because many of the pipes have become so corroded that not even phosphate will be able to fully encapsulate the surface of the pipes and prevent lead from leaching into the water supply.

165. The Class's properties have been affected in the same fashion. Even with the addition of phosphate, their pipes and appliances will remain corroded until replaced, and

37

continue to be a source of lead and potentially Legionella. Solubilized and particulate lead and Legionella remain in portions of the piping system and appliances, and can become remobilized at any time, causing further damage and health effects.

166. The effect of corrosive water on residential and commercial piping and appliances is well understood. For example, a 2014 study by the Water Research Watershed Center stated: "[w]ith respect to the corrosion potential of YOUR drinking water, the primary concerns include the potential presence of TOXIC Metals, such as lead and copper; deterioration and damage to the household plumbing, and aesthetic problems such as: stained laundry, bitter taste, and greenish-blue stains around basins and drains."

167. The Water Research Watershed Center has further explained that, "The cost of corrosion can be expensive. Corrosion can impact you and your family's health, aesthetic quality of your water, waste money, and damage your household piping and fixtures."

168. In addition to corrosion causing the "premature failure of household plumbing and plumbing fixtures," the Water Research Watershed Center has explained that corrosion also "decreases the efficiency of hot water heaters and may cause premature failure to the heater."

169. Moreover, many Flint residents have already reported damage to major appliances such as dishwashers and washing machines following Flint's decision to switch water sources.

170. According to emails from Governor Snyder's office, the State estimates that replacing Residents' pipes alone could cost between $6,000 and $8,000 per household. Other estimates of those replacement costs are far higher. Obviously, the cost to replace a residential building with multiple units will be far higher, costing tens and hundreds of thousands of dollars.

171. Corroded pipes not only present a continuing health threat; they risk further damage to one's property because corrosion can result in deep pits in the pipe or tank walls that

38

can eventually break, causing substantial water damage to residential buildings and individual units.

172. Although the City has stated it intends to begin replacing some City-owned pipes, this is far from sufficient to render Flint's water safe. Sergio Kapusta, a fellow at NACE International, an industry organization that develops corrosion prevention and control standards in Houston, has explained that "changing all the mains in the city will not really solve the problem for the homeowners" or residential property owners because the lead piping in these properties probably has been severely compromised. "The corrosion is not going away. It's still there."

173. Plaintiff and the Class have been left to pay for the damage caused by Defendants. To make matters worse, the Washington Post has reported that, "many in Flint say banks are refusing to offer refinancing that could free up money to pay for the retrofitting, and that the costs are not covered by insurance. The crisis has created a perfect storm to strip their houses of their remaining value, they say." Here, the Class has found it difficult or impossible to refinance their properties.

174. Replacing the piping and affected appliances in every residential structure is the only way to guarantee that a property will be unaffected by corrosion and lead moving forward. The cost of such replacements will range into the tens of thousands, if not more, per structure.

175. Plaintiff and the Class paid to install water filters in their properties for their tenants' benefit. They also supplied bottled water at their own expense.

176. Plaintiff and the Class rented their properties with water included at the owner's expense. This was a significant amount of money. However, when the state issued refunds,

39

Plaintiff and the Class received only a 20% refund while homeowners and other residents received a 100% refund of their water use.

## Class Action Allegations

177.    Plaintiff brings this action pursuant to Michigan Court Rule 3.501 on behalf of themselves and a Class of similarly situated persons and entities, which is defined as follows:

All persons and entities that have owned residential rental property in the City of Flint, Michigan since April 25, 2014.

178.    The following persons or entities are excluded from the Class: Defendants; Defendants' parent companies and their subsidiaries, agents or affiliates; Defendants' officers, directors, management, employees, subsidiaries, agents or affiliates; and federal governmental entities and instrumentalities of the federal government, the Judge to whom this case is assigned and the Judge's staff and immediate family.

179.    Plaintiff reserves the right to amend the Class definition if discovery and further investigation reveal that any Class should be expanded, divided into additional subclasses, or modified in any other way.

180.    Plaintiff believes that there are at least hundreds or thousands of Class members located in the United States, making the Class so numerous and geographically dispersed that joinder of all members is impracticable.

181.    Questions of law or fact that are common to the Class and that predominate over individual questions include:

a.  whether Defendants engaged in the conduct alleged herein;

b.  whether LAN and Veolia committed professional malpractice when they failed to conduct a root cause analysis;

40

    c.   whether LAN and Veolia committed professional malpractice when they failed to detect and advise that there is a corrosion problem that needed to be addressed;

    d.  whether LAN and Veolia committed professional malpractice when they recommended that Flint double its dosage of ferric chloride without adding a buffering agent and sufficient corrosion control;

    e.  whether Defendants knew or should have known that Flint's water supply indicated the presence of lead;

    f.  whether Defendants knew or should have known that Flint's water supply indicated the presence of Legionella;

    g.  whether Defendants took steps to conceal the presence of lead in Flint's water supply or otherwise falsely assured Plaintiff and the Class that Flint's water was safe;

    h.  whether Defendants' conduct was tortious under Michigan law, on the theories set forth herein;

    i.  whether Plaintiff and Class Members are entitled to damages and other monetary and equitable relief, and if so, in what amount and nature.

    182.   Plaintiff's claims are typical of the claims of Class members, and Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff and all members of the Class are similarly affected by Defendants' wrongful conduct in that they suffered damages as a direct and proximate result of Defendants' illegal conduct. Plaintiff's claims arise out of the same common course of conduct giving rise to the claims of the other Class members. Plaintiff's interests are in line with, and not antagonistic to, those of the other Class members.

183.    Plaintiff is represented by competent counsel with experience in the prosecution of class actions.

184.    The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

185.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy. The Class is readily definable. Prosecution as a class action will eliminate the possibility of repetitious litigation. Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would require. This action presents no difficulties in management that would preclude maintenance as a class action.

186.    In the alternative, Plaintiff seeks class certification as to particular issues as permitted under MCR 3.501(B)(3)(d)(i).    Plaintiff seeks certification as to the questions identified in Paragraph 180 (a) through (i).    Plaintiff respectfully maintains that the class certification for these issues is appropriate, as required by the Rule, because certification for these particular issues provides a superior to any alternative means of adjudication.    This is so because it eliminates the possibility of duplicative, inefficient litigation of identical issues.

### First Cause of Action
(Professional Negligence -- Against All Defendants)

187.    Plaintiff incorporates and realleges each allegation set forth in the preceding paragraphs of this Complaint.

188.    LAN and Veolia undertook, for substantial consideration, to render services for the City of Flint which each should have recognized as necessary for the protection of Plaintiff,

42

the putative class, and their property, and reasonably could and should have foreseen that the failure to satisfy the standard of reasonable engineering professionals in performing those services would harm Plaintiff, the putative class, and their property.

189. As a result, LAN and Veolia owed Plaintiff and the Class a duty to act with reasonable care in undertaking its obligations. As professional engineers, LAN and Veolia had duties to act as engineers of ordinary learning, judgment, or skill would.

190. As more fully described herein, LAN and Veolia breached their duties of care by (1) failing to conduct a complete root cause analysis and (2) recommending the addition of ferric chloride without some sort of corrosion control.

191. As a direct and proximate result of LAN and Veolia's negligence, Plaintiff and the Class have suffered and continue to suffer property damages.

## Second Cause of Action
(Gross Negligence -- Against All Defendants)

192. Plaintiff incorporates and realleges each allegation set forth in the preceding paragraphs of this Complaint.

193. Defendants owed Plaintiff and the putative class a duty to exercise reasonable care. Upon learning of the release of the contaminants, Defendants owed Plaintiff and the Class a duty to act reasonably to remediate, contain, and eliminate the contamination before it injured Plaintiff, the Class and their property and/or to act reasonably to minimize the damage to their property.

194. Defendants, individually and collectively, caused drinking water with concentrations of lead exceeding applicable standards, and *Legionella*, to be provided to Plaintiff and the Class in contravention of federal environmental statutes and guidelines. As such,

43

Defendants with gross negligence, recklessly, willfully, wantonly, and/or intentionally contaminated drinking water in and around the real property of Plaintiff and the Class.

195.    LAN and Veolia owed Plaintiff and the Class a duty to act with reasonable care in undertaking its obligations. As professional engineers, LAN and Veolia had duties to act as engineers of ordinary learning, judgment, or skill would. As more fully described herein, LAN and Veolia breached their duties of care by (1) failing to conduct a complete root cause analysis and (2) recommending the addition of ferric chloride without a proper corrosion control. As a direct and proximate result of LAN's and Veolia's gross negligence, Plaintiff and the Class have suffered and continue to suffer property damages.

196.    Defendants' conduct was so reckless as to demonstrate a substantial lack of concern for whether injury would result to Plaintiff or the Class.

### Third Cause of Action
(Negligence -- Against All Defendants)

197.    Plaintiff incorporates and realleges each allegation set forth in the preceding paragraphs of this Complaint.

198.    Defendants owed Plaintiff and the putative class a duty to exercise reasonable care.

199.    Defendants, individually and collectively, breached their duty of reasonable care by allowing contaminants to be released into the drinking water of the City of Flint, including but not limited to lead, and failing to prevent or alert Flint about the corrosion problem.

200.    Upon learning of the release of the contaminants, Defendants owed Plaintiff and the Class a duty to act reasonably to remediate, contain, and eliminate the contamination before it injured Plaintiff, the Class and their property and/or to act reasonably to minimize the damage to Plaintiff, the Class and their property.

44

201. Defendants breached that duty by failing to act reasonably in providing Plaintiff and the Class usable water. Furthermore, Defendants failed to take reasonable, adequate and sufficient steps or action to eliminate, correct, or remedy any contamination after they occurred.

202. Defendants further breached that duty by failing to timely notify the Plaintiff and the Class of the contamination of Flint's drinking water, and, consequently, the presence of lead and other contaminants in the residential buildings and rental properties of Plaintiff and Class Members.

203. As a result of Defendants' breaches of their duty to timely notify, Plaintiff and the Class were forestalled from undertaking effective and immediate remedial measures, and Plaintiff and the Class have expended and/or will be forced to expend significant resources to test, monitor, and remediate the effects of Defendants' negligence for many years into the future.

204. Defendants negligently breached their duties to the Plaintiff and the Class to ensure that the Flint water supply was safe and sufficiently secure as to prevent the release of the contaminants into the water facilities and, consequently, the residential buildings and rental properties of Plaintiff and Class Members.

205. Defendants willfully and wantonly breached their legal duty to properly remediate the contamination despite full knowledge of the extent of the contamination and the threat it poses to human health and safety and the damage it poses to physical structures.

206. LAN and Veolia owed Plaintiff and the Class a duty to act with reasonable care in undertaking its obligations. As professional engineers, LAN and Veolia had a duty to act as an engineer of ordinary learning, judgment, or skill would. As more fully described herein, LAN and Veolia breached their duties of care by (1) failing to conduct a complete root cause analysis and (2) recommending the addition of ferric chloride without concomitant corrosion control.

207.    As a direct and proximate result of Defendants' negligence, Plaintiff and the Class have suffered and continue to suffer property damages.

### Fourth Cause of Action
(Unjust Enrichment -- Against All Defendants)

208.    Plaintiff incorporates and realleges each allegation set forth in the preceding paragraphs of this Complaint.

209.    Plaintiff and the Class were sold water that was unfit for human consumption instead of receiving clean, safe drinking water, as promised to Plaintiff, the Class, and their tenants.

210.    LAN and Veolia unjustly received compensation for providing engineering services that did not satisfy their duties of professional responsibility.

211.    Accordingly, Defendants should be ordered to disgorge their unjustly retained benefits.

### Fifth Cause of Action
(Tortious Interference with a Business Relationship or Expectancy -- Against All Defendants)

212.    Plaintiff incorporates and realleges each allegation set forth in the preceding paragraphs of this Complaint.

213.    Plaintiff and the Class had a business relationship or expectancy with the City and/or the appropriate utility that provided water to Flint and all its buildings. Plaintiff and the Class paid money for clean, potable water.    Plaintiff and the Class also had a business relationship or expectancy with their tenants.    Their tenants paid them for a habitable housing unit that provides clean water.

214.    Defendants had knowledge of the relationship or expectancy at all relevant times.

46

215.    Defendants deliberately acted, as described herein, in a manner that induced breach of the business relationship or expectancy with both the City/utility and the tenants.

216.    Defendants' conduct, as described herein, damaged Plaintiff and the Class in the manner enumerated herein.

### Sixth Cause of Action
(Tortious Interference with a Contract or Contractual Relationship -- Against All Defendants)

217.    Plaintiff incorporates and realleges each allegation set forth in the preceding paragraphs of this Complaint.

218.    Plaintiff and the Class had a contract or contractual relationship with the City and/or the appropriate utility that provided water to Flint and all its buildings.  Plaintiff and the Class contracted to pay money in return clean, potable water.   Plaintiff and the Class also had a contract or contractual relationship with their tenants.   They contracted with their tenants to receive money in return for providing for a habitable housing unit that provides clean water.

219.    Defendants had knowledge of the contracts or contractual relationships at all relevant times.

220.    Defendants deliberately acted, as described herein, in a manner that induced breach of the contracts or contractual relationships with both the City/utility and the tenants.

221.    Defendants' conduct, as described herein, damaged Plaintiff and the Class in the manner enumerated herein.

WHEREFORE, Plaintiff prays as follows:

A. That the Court determines that this action may be maintained as a class action under Michigan Court Rule 3.501;

B. That judgment be entered for Plaintiff and Class members against Defendants for property damages sustained as a direct and proximate cause of Defendants' conduct as well as any punitive damages or disgorgement monies owed to Plaintiff and the Class;

C. That Plaintiff and the Class recover pre-judgment and post-judgment interest as permitted by law;

D. That Plaintiff and the Class recover their costs of the suit, including attorney's fees, as provided by law; and

E. For such other and further relief as is just and proper under the circumstances.

## JURY DEMAND

Plaintiff demands trial by jury in all matters so triable.

Respectfully submitted,

**THE ABOOD LAW FIRM**
*Attorneys for Plaintiff*

Dated: Sept. 9, 2016

**Andrew P. Abood (P43366)**
**David Wolkinson (P69443)**
**Jeffrey Lance Abood (P72607)**
**Erica A. DeAngelis (P75894)**
470 N. Old Woodward Ave., Ste. 250
Birmingham, Michigan 48009
248.549.0000

48